UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

United States of America,

      Plaintiff,

v.                                                    Criminal Case No. 11-20606

D-1 Gregg Blaney,                      Honorable Sean F. Cox

      Defendant.

_____/

## **MEMORANDUM OPINION**

Defendant Gregg Blaney ("Blaney") pleaded guilty to Count Two of the Superseding Indictment, which charges bank fraud in violation of 18 U.S.C. § 1344.   This Court held a Sentencing Hearing on April 17, 2013.  Based upon the parties' respective written submissions, and the evidence and oral argument presented at the hearing, the Court now issues the following as its decision on the issues of: 1) relevant conduct; and 2) amount of loss calculation.

For the reasons below, the Court concludes that the relevant conduct includes all twelve of the real estate transactions included in the Presentence Report.  The Court further concludes that the reasonably foreseeable pecuniary harm in this case is the amount of the mortgage loans, which total $856,100.00.   After applying appropriate credits for sales proceeds received by the defrauded lenders, and payments made on the mortgages, the adjusted total loss is $801,634.48, which results in a 14-point increase under U.S.S.G. § 2B1.1(b)(1).

In addition, the Court agrees with the Government that the decision as to whether the Government wishes to file a motion for a downward departure, so that Blaney can obtain an

additional one-point reduction for acceptance of responsibility, is a matter within the

Government's discretion.  Nevertheless, in determining an appropriate sentence for Blaney, this

Court will consider all of the §3553 factors, including the need to avoid unwarranted sentencing

disparities.

## BACKGROUND

Blaney pleaded guilty to Count Two of the Superseding Indictment, which charges bank

fraud in violation of 18 U.S.C. § 1344, pursuant to a Rule 11 Agreement.  (Docket Entry No. 74).

The Rule 11 Agreement's factual basis for the guilty plea discussed the purchase of 19630 Pelkey

Street in Detroit, Michigan:

> From in and around June 2006 and continuing in and around December
> 2007, in the Eastern District of Michigan, defendant Gregg Blaney (D-1),
> knowingly and with the intent to defraud, devised a scheme to obtain funds under
> the custody or control of "financial institutions" as defined in 18 U.S.C. § 20,
> including but not limited to Chase Bank USA, N.A. ("Chase Bank"), by means of
> materially false representations or omissions.
>
> Defendant Blaney accomplished this scheme by causing the presentation
> of fraudulent Uniform Residential Loan Applications and other loan documents,
> which contained material misrepresentations and omissions, thereby inducing the
> "financial institutions" (including Chase Bank) to approve and fund mortgage
> loans so that the defendant Blaney could obtain a portion of the mortgage loan
> proceeds.  This scheme included, but was not limited to, the following real estate
> transaction.
>
> On or about March 19, 2007, defendant Blaney and others obtained a
> mortgage loan from Chase Bank for the purchase of the property located at 19630
> Pelkey Street, Detroit, Michigan in the name of P.M.  Defendant Blaney caused
> the submission of fraudulent Uniform Residential Loan Application and related
> loan documents (collectively, the "Pelkey Loan Package") to Chase Bank for the
> purchase of this property.  As known to defendant Blaney, the Pelkey Loan
> Package omitted the material fact that defendant Blaney provided P.M. funds to
> use for the required down payment.
>
> The Pelkey Loan Package was approved by Chase Bank in the amount of
> $76,000.00.  On or about March 19, 2007, Chase Bank sent the loan proceeds to

2

Colonial Title Company to close the real estate transaction.

(Docket Entry No. 74 at 2-3)

The Rule 11 Agreement states that it is the Government's position that "relevant conduct in this case included over 50 fraudulent mortgage loans that were applied for and approved between June 2006 to December 2007.  The sum of those loans is $3,719,650, and the Sentencing Guidelines 'loss' amount attributable to those loans is more than $400 thousand." (Rule 11 Agreement at 3).

The Rule 11 Agreement states that Blaney "disputes the government's computation of loss, and will submit a proposal as to the amount of loss as part of the defendants version of the case.  Accordingly, the defendant reserves the right to argue for an applicable guideline range as low as 0 to 6 months, assuming a loss amount of $0."  (Rule 11 Agreement at 3).

An initial presentence investigation report ("PSR") was prepared by a probation officer. The PSR calculates the total amount of loss, based on twelve different real estate transactions, at $457,580.00.  (*See* PSR at ¶¶ 16-18 & 20-28).  It states that: 1) as to Offense Conduct: "[f]or guideline calculation purposes [Blaney] will be held accountable for a total loss of $457,580.00." (PSR at ¶ 29); and 2) as to Offense Computation: the 2011 Guidelines Manual was used to determine Blaney's offense level (USSG § 1B1.11) and as to Specific Offense Characteristics, the "loss amount exceeded $400,000.00 but is less than $1,000,000.00".  (PSR at ¶ 35).

The PSR includes a two-point reduction for acceptance of responsibility.  (PSR at ¶ 41). The PSR also states as follows:

<u>Adjustment for Acceptance of Responsibility</u>

32.     It appears BLANEY accepted responsibility for his involvement in the instant offense.  The defendant is, therefore, eligible for an adjustment for

3

> acceptance of responsibility. The probation department spoke with Patrick J. Hurford who advised that the government does not intend to file a motion requesting the one additional level reduction for acceptance of responsibility as the defendant pled guilty the day before his jury trial was scheduled to begin.

(PSR at ¶ 36).

The PSR indicates that there are objections to it, asserted by both the Government and Blaney.

Blaney asserts two different objections that relate to relevant conduct. First, Blaney objects to the real estate transactions listed in Paragraphs 20 through 28 of the PSR, asserting that those transactions do not constitute other relevant conduct for the purposes of sentencing. (PSR at A-3). Second, Blaney objects to the transactions listed in Paragraphs 20-24 of the PSR. He contends that these transactions are not relevant conduct because the lender at issue with respect to these transactions was Long Beach Mortgage Company. He argues that Long Beach "was a wholly owned subsidiary of Washington Mutual, and not a federally insured institution at the time these loans were made." (PSR at A-3).

### 2.    Objections Regarding Amount of Loss

Both the Government and Blaney object to the loss calculation in the PSR. The Government objects to the final loss calculation of $457,580.00 as being too low. (PSR at A-1).

Blaney objects to the loss calculation as being too high. Blaney objects to "Paragraphs 16 through 28" of the PSR, asserting that those paragraphs improperly calculate the amount of the loss relating to the real estate transactions at issue herein because the calculations fail to take into consideration any payments made by the borrowers to the lender on the mortgages. (Objection 3, PSR at A-2). Blaney also asserts that the calculations improperly estimate the current market

4

value of the subject properties using tax records and/or the foreclosure purchase price because neither of those methods accurately estimates current market value. He further argues that the calculations fail to consider the market downturn and the lenders' failure to mitigate their losses. (PSR at A-2).

In addition to the above objections, the parties submitted briefs setting forth their respective positions. Blaney filed an "*In Camera* Motion For A Downward Departure And Variance From The Recommended Guideline Range" (Docket Entry No. 88), in which he sets forth his position on the relevant conduct and amount of loss issues. In that motion, Blaney also asserted his belief that the Government intends to move for a downward departure in the recommended guideline range for his Co-Defendant Gerald Payton. Blaney suggests that, in order to avoid unwarranted sentencing disparities, he should also be credited with an additional one-point reduction for acceptance of responsibility – regardless of whether the Government files such a motion. (Def.'s Br. at 19; 4/17/13 Hrg. Tr.).

In response, the Government filed a "Brief In Opposition To Defendant Blaney's Motion For A Downward Departure And Variance From The Recommended Guideline Range", in which it set forth its position on these same issues.

On April 17, 2013, the probation officer issued a written amendment to the PSR ("the Amended PSR"). The Amended PSR states, in pertinent part:

> This letter is to inform the Court of the United States Probation Department's position on how to determine the appropriate loss amount in the defendant's case. The [PSR], which was previously disclosed to all parties, used the 2011 tax records to determine the loss amount for 10 of the 12 properties in question. In other words, the probation department established the loss amount by subtracting the value of the house from the loan amount. However, the government has since provided the United States Probation Department with new information indicating

5

that 10 of the properties in question went into foreclosure. Therefore, it is the United States Probation Department's position that pursuant to USSG §2B1.1, comment (n.3Eii), BLANEY is held accountable for the loan amount on the 10 properties that went into foreclosure as no collateral was recovered on these properties. The probation department still maintains the loss amounts determined as $68,300.00 and $71,000.00, for 17215 Westphalia and 18455 Revere, respectively, were calculated correctly in the presentence report.

Considering all of the above, the new loss amount which the United States Probation Department would hold the defendant, GREGG BLANEY, accountable for would be $854,100.00. The higher loss amount does not impact the total offense level. In other words, the base offense level is still seven. Fourteen levels are added as the loss amount exceeded $400,000.00, but was less than $1,000,000.00. This establishes an adjusted offense level of 21. Two levels are subtracted for acceptance of responsibility; therefore, the total offense level remains 19.

(Amended PSR at 1).

This Court held a Sentencing Hearing in this matter on April 17, 2013. At that time, the Court allowed the parties to present evidence and the Court also heard oral argument from counsel.

The Government presented one witness, Special Agent Patrick Killeen with the Federal Bureau of Investigation ("F.B.I."). The Government also submitted twenty-three exhibits.

Blaney presented one witness, Chip Cummings. Blaney also submitted seven exhibits at the hearing.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Having heard and observed the witnesses who testified at the evidentiary hearing, allowing for this Court to assess credibility, having considered the arguments presented by counsel, and having applied the governing legal principles, the Court makes the following

6

findings of fact and conclusions of law.[1]

## FINDINGS OF FACT

Special Agent Patrick Killeen has a Bachelor of Science Degree in accounting from the University of Dayton.  He is a Certified Public Accountant, although his certification is currently inactive.  He also earned a Master of Business Administration degree from the University of Michigan, with a concentration in finance.  He has worked for the F.B.I. for ten years.  Prior to working for the F.B.I., Special Agent Killeen worked for two and half years in public accounting, with Arthur Anderson.  This Court finds Special Agent Killeen to be a highly credible witness.

Blaney worked as a loan officer[2] at the Mortgage Institute of Michigan ("MIM") and also owns a company called GVB Consulting.

Special Agent Killeen was the F.B.I. Agent assigned to investigate a bank fraud scheme involving Blaney and his Co-Defendant Gerald Payton ("Payton").   As such, he was intimately involved in the criminal investigation of Defendants Blaney and Payton, that ultimately led to the criminal charges in this action.  Although the investigation of Blaney involved many more real estate transactions, Special Agent Blaney testified regarding twelve specific real estate transactions that Blaney was involved with.

With respect to each of these transactions, Blaney facilitated loans for buyers of properties in Detroit, Michigan and did so by following the same fraudulent scheme.  That

---

[1]To the extent that a finding of fact is more properly a conclusion of law, and the to the extent that a conclusion of law is more properly a finding of fact, it should be so construed.

[2]After Blaney stopped officially working as a loan officer at MIM, Blaney continued to facilitate loan applications and would simply put other people's names as the loan officer on the applications.

scheme involved Blaney facilitating loans for buyers of properties in Detroit, Michigan, by: 1) arranging for the funding of the down payments on the properties involved in the transactions, either directly paying the down payments himself or through his companies, or by reimbursing the buyer for the down payment or finding another way to have the down payment paid by someone other than the buyer; 2) causing loan applications to be submitted by the buyers, with material misrepresentations or omissions, including representations that the buyer was providing the down payment when that was not the case, and failing to disclose that Blaney was receiving a portion of the sales proceeds outside of closing, from the sellers of the properties.  In order to avoid detection, Blaney arranged for the closing of each of the transactions to occur at Colonial Title Agency, with Co-Defendant Payton as the closing agent for the transactions.  Payton was a necessary part of Blaney's scheme because the title company is responsible for helping create the HUD statements for the transactions, and also takes the down payment from the buyer.  Payton knew that Blaney was receiving a portion of the sales proceeds after the closing of the transactions, but agreed not to document that on the HUD statements submitted by Colonial Title Agency with respect to these transactions.

**Pelkey Transaction**

Blaney pleaded guilty to Count Two of the Superseding Indictment, which charges bank fraud in violation of 18 U.S.C. § 1344, pursuant to a Rule 11 Agreement.  (Docket Entry No. 74). The Rule 11 Agreement's factual basis for the guilty plea discussed the purchase of 19630 Pelkey Street in Detroit, Michigan:

> From in and around June 2006 and continuing in and around December 2007, in the Eastern District of Michigan, defendant Gregg Blaney (D-1), knowingly and with the intent to defraud, devised a scheme to obtain funds under

the custody or control of "financial institutions" as defined in 18 U.S.C. § 20, including but not limited to Chase Bank USA, N.A. ("Chase Bank"), by means of materially false representations or omissions.

Defendant Blaney accomplished this scheme by causing the presentation of fraudulent Uniform Residential Loan Applications and other loan documents, which contained material misrepresentations and omissions, thereby inducing the "financial institutions" (including Chase Bank) to approve and fund mortgage loans so that the defendant Blaney could obtain a portion of the mortgage loan proceeds. This scheme included, but was not limited to, the following real estate transaction.

On or about March 19, 2007, defendant Blaney and others obtained a mortgage loan from Chase Bank for the purchase of the property located at 19630 Pelkey Street, Detroit, Michigan in the name of P.M. Defendant Blaney caused the submission of fraudulent Uniform Residential Loan Application and related loan documents (collectively, the "Pelkey Loan Package") to Chase Bank for the purchase of this property. As known to defendant Blaney, the Pelkey Loan Package omitted the material fact that defendant Blaney provided P.M. funds to use for the required down payment.

The Pelkey Loan Package was approved by Chase Bank in the amount of $76,000.00. On or about March 19, 2007, Chase Bank sent the loan proceeds to Colonial Title Company to close the real estate transaction.

(Docket Entry No. 74 at 2-3; *see also* Tr. of 6/6/12 Plea Hrg.)[3]

In addition, the evidence presented at the April 17, 2013, hearing reflects the following facts as to the Pelkey Street Transaction.

Blaney facilitated the sale of real estate located at 19630 Pelkey Street in Detroit, Michigan. Blaney was the loan officer who submitted the loan application on behalf of the buyer. That application falsely stated that the buyer would be paying the down payment out of his own funds. It also contained misrepresentations regarding the buyer's income and liabilities.

This transaction closed on March 19, 2007, with Payton at Colonial Title acting as the

---

[3]Thus, there is no dispute that the real estate transaction involving the Pelkey Street Property is relevant conduct.

closing agent.  That seller was Oliver Property Holdings and the buyer was Patrick Miller.

Jayson Oliver is the registered agent for Oliver Holdings.  The lender was Chase Bank.  The sales

price was $102,000.00 and the loan amount was $76.085.91.  Prior to closing, Blaney gave the

buyer a check for $7,800.00 from GVB Consulting, to be used toward the down payment.  At

closing, two checks were submitted to pay the down payment.  After having received the

$7,800.00 from Blaney, the buyer submitted a check for $8,000.00 at closing.  In addition,

another check was submitted to pay the remainder of the down payment and that check was

traced to the GVB Consulting account at TCF Bank.  After the closing, Jayson Oliver gave

Blaney a check made out to GVB Consulting for $63,514.00

      The HUD Statement did not disclose the payment of $63,514.00 (ie., the "kick-back")

from Jayson Oliver to Blaney

**Other Transactions Where Oliver Property Holdings Was The Seller**

      In addition to the above transaction, Blaney was involved in several other transactions

wherein Oliver Property Holdings was the seller of the real estate.  Those transactions include the

following.

      **Tacoma Transaction**

      Blaney facilitated the sale of real estate located at 13200 Tacoma Street in Detroit,

Michigan.  Blaney was responsible for submitting the loan application on behalf of the buyer.

That application falsely stated that the buyer would be paying the down payment out of his own

funds.  It also contained misrepresentations regarding the buyer's income and liabilities.

      This transaction closed on November 7, 2006, with Payton at Colonial Title acting as the

closing agent.  That seller was Oliver Property Holdings  and the buyer was Jonathan Kujda.  The

10

lender was Washington Mutual Bank.  The sales price was $77,000.00 and the loan amount was $69,300.00.  The buyer did not make the down payment from his own funds.

After the closing, an entity associated with Jayson Oliver gave Blaney a check made out to GVB Consulting for $55,271.00.  The HUD Statement did not disclose the kick-back paid to Blaney.

### Westphalia Transaction

Blaney facilitated the sale of real estate located at 17215 Westphalia Street in Detroit, Michigan.  Blaney was responsible for submitting the loan application on behalf of the buyer. That application falsely stated that the buyer would be paying the down payment out of his own funds.  It also contained misrepresentations regarding the buyer's income and liabilities.

This transaction closed on November 7, 2006, with Payton at Colonial Title acting as the closing agent.  That seller was Oliver Property Holdings  and the buyer was Jonathan Kujda.  The lender was Washington Mutual Bank.  The sales price was $77,000.00 and the loan amount was $69,300.00.  The buyer did not make the down payment from his own funds.

After the closing, an entity associated with Jayson Oliver gave Blaney a check made out to GVB Consulting for $41,860.00.  The HUD Statement did not disclose the kick-back paid to Blaney.

### Transactions Where An Entity Associated With Richard Radner Was The Seller

Blaney was involved in several transactions wherein an entity associated with, or owned by, Richard Radner was the seller of the real estate.

### Thornton Transaction

Blaney facilitated the sale of real estate located at 13674 Thornton Street in Detroit,

Michigan.  Blaney was responsible for submitting the loan application on behalf of the buyer.
That application falsely stated that the buyer would be paying the down payment out of her own
funds.  It also contained misrepresentations regarding the buyer's income and liabilities.

This transaction closed on November 7, 2007, with Payton at Colonial Title acting as the
closing agent.  That seller was Nevada Corp. (owned by Richard Radner) and the buyer was
Letitia Miller (Patrick Miller's wife).  The lender was Chase Bank.  The sales price was
$80,000.00 and the loan amount was $62,655.92.  The buyer did not make the down payment
from her own funds.

After the closing, an entity associated with Richard Radner gave Blaney a check made out
to GVB Consulting for $31,000.00.  The HUD Statement did not disclose the kick-back paid to
Blaney.

**Sussex Transaction**

Blaney facilitated the sale of real estate located at 9331 Sussex Street in Detroit,
Michigan.  Blaney was responsible for submitting the loan application on behalf of the buyer.
That application falsely stated that the buyer would be paying the down payment out of his own
funds.  It also contained misrepresentations regarding the buyer's income and liabilities.

This transaction closed on January 26, 2007, with Payton at Colonial Title acting as the
closing agent.  That seller was Canyon Associates, LLC (an entity owned or associated with
Richard Radner) and the buyer was Jonathan Kujda  The lender was Washington Mutual Bank.
The sales price was $75,000.00 and the loan amount was $67,500.00.  The buyer did not make
the down payment from his own funds.

After the closing, an entity associated with Richard Radner gave Blaney a check made out

12

to GVB Consulting for $58,595.00.  The HUD Statement did not disclose the kick-back paid to Blaney.

### Ferguson Transaction

Blaney facilitated the sale of real estate located at 19332 Ferguson Street in Detroit, Michigan.  Blaney was responsible for submitting loan application on behalf of the buyer.  That application falsely stated that the buyer would be paying the down payment out of her own funds. It also contained misrepresentations regarding the buyer's income and liabilities.

This transaction closed on April 27, 2007, with Payton at Colonial Title acting as the closing agent.  That seller was Kansas Corp. (an entity owned or associated with Richard Radner) and the buyer was Letitia Miller  The lender was Chase Bank.  The sales price was $75,000.00 and the loan amount was $63,750.00.  The buyer did not make the down payment from his own funds.

After the closing, an entity associated with Richard Radner gave Blaney a check made out to GVB Consulting for $30,825.00.  The HUD Statement did not disclose the kick-back paid to Blaney.

### Stout Transaction

Blaney facilitated the sale of real estate located at 8891 Stout Street in Detroit, Michigan. Blaney was responsible for submitting the loan application on behalf of the buyer.  That application falsely stated that the buyer would be paying the down payment out of his own funds. It also contained misrepresentations regarding the buyer's income and liabilities.

This transaction closed on April 12, 2007, with Payton at Colonial Title acting as the closing agent.  That seller was Blueland Investments, LLC (an entity owned or associated with

13

Richard Radner) and the buyer was Jonathan Kujda.  The lender was Chase Bank.  The sales price was $78,000.00 and the loan amount was $55,250.00.  The buyer did not make the down payment from his own funds.

After the closing, an entity associated with Richard Radner gave Blaney a check made out to GVB Consulting for $31,660.00.  The HUD Statement did not disclose the kick-back paid to Blaney.

**Lauder Transaction**

Blaney facilitated the sale of real estate located at 9419 Lauder Stout Street in Detroit, Michigan.  Blaney was responsible for submitting the loan application on behalf of the buyer. That application falsely stated that the buyer would be paying the down payment out of his own funds.  It also contained misrepresentations regarding the buyer's income and liabilities.

This transaction closed on July 12, 2007, with Payton at Colonial Title acting as the closing agent.  That seller was Vermont Company (an entity owned or associated with Richard Radner) and the buyer was Jonathan Kujda.  The lender was Chase Bank.  The sales price was $69,000.00 and the loan amount was $58,650.00.  The buyer did not make the down payment from his own funds.

After the closing, an entity associated with Richard Radner gave Blaney a check made out to GVB Consulting for $28,892.00.  The HUD Statement did not disclose the kick-back paid to Blaney.

**Revere Transaction**

Blaney facilitated the sale of real estate located at 18455 Revere Street in Detroit, Michigan.  Blaney was responsible for submitting the loan application on behalf of the buyer.

14

That application falsely stated that the buyer would be paying the down payment out of her own funds. It also contained misrepresentations regarding the buyer's income and liabilities.

This transaction closed on September 27, 2007, with Payton at Colonial Title acting as the closing agent. That seller was Nevada Corp. (an entity owned or associated with Richard Radner) and the buyer was Letitia Miller. The lender was IndyMac Bank. The sales price was $90,000.00 and the loan amount was $72,000.00. The buyer did not make the down payment from his own funds.

After the closing, an entity associated with Richard Radner gave Blaney a check made out to GVB Consulting for $40,000.00. The HUD Statement did not disclose the kick-back paid to Blaney.

**Other Transactions**

Blaney was also involved in numerous other transactions with various other sellers, including the following.

### Turner Transaction

Blaney facilitated the sale of real estate located at 15817 Turner Street in Detroit, Michigan. Blaney was responsible for submitting the loan application on behalf of the buyer. That application falsely stated that the buyer would be paying the down payment out of her own funds. It also contained misrepresentations regarding the buyer's income and liabilities.

This transaction closed on June 18, 2007, with Payton at Colonial Title acting as the closing agent. That seller was Ronald Johnson and the buyer was Letitia Miller (Patrick Miller's wife). The lender was Chase Bank. The sales price was $95,000.00 and the loan amount was $80,362.68. The buyer did not make the down payment from her own funds. Rather, the

15

$16,494.00 down payment was paid by GVB Consulting.

**Buckingham Transaction**

Blaney facilitated the sale of real estate located at 4001 Buckingham Street in Detroit, Michigan.  Blaney was responsible for submitting the loan application on behalf of the buyer.  That application falsely stated that the buyer would be paying the down payment out of his own funds.  It also contained misrepresentations regarding the buyer's income and liabilities.

This transaction closed on August 28, 2006, with Payton at Colonial Title acting as the closing agent.  That seller was T&S Enterprises  and the buyer was Patrick Miller.  The lender was Washington Mutual Bank.  The sales price was $112,000.00 and the loan amount was $100,800.00.  The buyer did not make the down payment from his own funds.

**Kendall Transaction**

Blaney facilitated the sale of real estate located at 3050 Kendall Street in Detroit, Michigan.  Blaney was responsible for submitting the loan application on behalf of the buyer.  That application falsely stated that the buyer would be paying the down payment out of his own funds.  It also contained misrepresentations regarding the buyer's income and liabilities.

This transaction closed on August 26, 2006, with Payton at Colonial Title acting as the closing agent.  That seller was Luebirda Cook and the buyer was Patrick Miller.  The lender was Washington Mutual Bank.  The sales price was $87,000.00 and the loan amount was $78,300.00.  The buyer did not make the down payment from his own funds.

**Payments Made On Mortgages**

With respect to each of the above mortgages, the lender was a federally-insured financial institution.

16

It is undisputed that, prior to foreclosure, the lenders collectively received a total of $52,242.52 in payments on the mortgages that the various buyers obtained.  That amount consists of the following payments: 1) $10,966.80 (Ferguson); 2) 1,128.16 (Lauder); 3) $7,550.07 (Turner); 4) $ 3,507.13 (Pelkey); 5) 14,713.08 (Buckingham); and 6) $14,377.28 (Revere).

**All Of The Mortgages Were Foreclosed**

It is undisputed that all of the above mortgages were foreclosed following default by the borrowers.  As to the properties securing the mortgages for the following transactions, the mortgages were foreclosed and the properties were forfeited to the Wayne County Treasurer, for unpaid taxes: 1) Pelkey; 2) Thornton; 3) Turner; 4) Sussex; 5) Ferguson; 6) Stout; 7) Lauder; 8) Tacoma; 9) Buckingham; and 10) Kendall.  (*See* Govt.'s Exs. 14-23).  Thus, Wayne County took title to those properties and the respective lenders no longer have title to, or any interest in, those properties. These lenders received no money at or following foreclosure.

As to the properties securing the mortgages for two transactions, Revere and Westphalia, the mortgages were foreclosed but the lenders bid on the properties[4] and then subsequently sold the properties to third-parties.  The lenders sold: 1) the Revere property for $1,000.000; and 2) the Westphalia property for $1,223.00.

With respect to each of the mortgages for the twelve transactions, the lender did not receive any other payments or sales proceeds.  None of the lenders at issue were reimbursed for

---

[4]As Special Agent Killeen explained during his testimony, those entities bid on the properties in order to take possession of the properties – but no money actually changed hands. That is, the lenders did not "pay twice" as to those properties.

the outstanding loan principal balances.[5]

## CONCLUSIONS OF LAW

**I.      Relevant Conduct**

As Blaney acknowledges, in calculating the amount of loss of U.S.S.G. §2B1.1(b)(1), the guidelines look not only to the conduct of the offense for which the defendant is guilty, but to all relevant conduct by the defendant.  (Def.'s Br. at 13).  Blaney makes two arguments as to which transactions should be included as relevant conduct.

**A.      Transactions were Similar**

First, Blaney contends that eleven of the twelve transactions identified in the PSR do not constitute relevant conduct because those transaction are too dissimilar to the Pelkey Transaction to constitute other relevant conduct.  (*Id*.).

"[R]elevant conduct is not limited to conduct for which the defendant has been convicted." *United States v. Maken,* 510 F. 3d 654, 658 (6th Cir. 2007).  Under U.S.S.G. § 1B1.3(a)(1)(A), relevant conduct for sentencing purposes includes "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant."

In addition, under U.S.S.G. § 1B1.3(a)(2), relevant conduct includes "'all acts and omissions [committed by the defendant] that were part of the same course of conduct or common

---

[5]Nevertheless, the internal servicing notes of some lenders have notations such as "charged off", "settled" or "paid in full" as to these mortgages.  Special Agent Killeen interviewed representatives from the lenders, who advised that such notes are simply a formality of moving a loan from one accounting system to another.  Such notes do not reflect that any payments were actually received by the lender.

scheme or plan as the offense of conviction.'" *Maken*, 510 F.3d at 657.  As explained in *Maken*:

> The commentary to §1B1.3 defines "common scheme or plan": "[f]or two or more offenses to constitute part of a common scheme or plan, they must be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar modus operandi."  U.S.S.G. §1B1.3 cmt. n.9.  Additionally, the commentary explains that "[o]ffenses that do not qualify as part of a common scheme or plan may nonetheless qualify as part of the same course or conduct if they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses."  *Id.*  Factors appropriate for the court to consider in determining whether offenses constitute the "same course of conduct" include "the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and time interval between the offenses."  *Id.*

Maken, 510 F.3d at 657.

Trial courts have wide discretion in considering evidence submitted at sentencing. *United States v. Silverman*, 976 F.2d 1501, 1508 (6th Cir. 1992)).

Having considered the evidence presented at the April 17, 2013, hearing, this Court finds that the Government has established, by a preponderance of the evidence, that Blaney committed bank fraud with respect to each of the twelve transactions listed in the PSR.  This Court concludes that all twelve of the transactions constitute relevant conduct for purposes of sentencing, pursuant to U.S.S.G. §1B1.3(a)(1)(A).

In addition, all twelve of the transactions constitute relevant conduct for purposes of sentencing, pursuant to U.S.S.G. §1B1.3(a)(2), because Blaney's conduct with respect to these transactions may be categorized both as a "common scheme or plan" and the same "course or conduct."

Blaney concedes that the Pelkey Transaction is relevant conduct.  The other eleven transactions follow a strikingly similar pattern.

19

All twelve of these transactions involve common accomplices and victims.   As to victims, these transactions share the same victims –  the same three financial institutions (Chase, Washington Mutual Bank, and IndyMac Bank).  They also share the same accomplices.  Blaney used his Co-Defendant, Gerald Payton, to act as the title closer for every one of these transactions.  And these transactions involve a common cast of buyers and sellers (e.g, Patrick and Letita Miller and Jonathan Kujda as sellers and entities controlled by Richard Radner and Jayson Oliver as sellers).  These transactions also share the same *modus operandi* – inducing lenders to loan money to unqualified buyers by: 1) furnishing or arranging of down payments for the buyers, while representing the buyers would make the down payments from their own funds; 2) arranging for the submission of loan applications that misrepresent the buyers' income and liabilities; and 3) not disclosing kickback payments from the sellers to Blaney.  These transactions also share temporal proximity as all of them occurred within a relatively short period of time.

Accordingly, the Court concludes that all twelve of the transactions constitute relevant conduct for purposes of sentencing, pursuant to U.S.S.G. §1B1.3(a)(1)(A) and (a)(2).

### B.    Federally Insured

Next, Blaney argues five of the twelve transactions should not be included as relevant conduct because those loans "were funded by Long Beach Mortgage Company ("Long Beach"), which was not a federally insured institution."  (Def.'s Br. at 14; PSR at A-3, objecting to transactions identified at ¶¶ 20-24 being included as relevant conduct, which are the following properties: Buckingham, Kendall, Westphalia, Tacoma, and Sussex).  Blaney argues that any misrepresentations made to Long Beach by him "would not constitute criminal activity under 18

U.S.C. 1344" and, therefore, these transactions cannot be considered other relevant conduct for sentencing purposes."  (*Id.* at 14).

This Court rejects Blaney's argument that five of the transactions cannot be considered relevant conduct because Long Beach was the lender as to those transactions.  The evidence presented at the April 17, 2013, hearing reflects that Washington Mutual Bank, which was a federally-insured bank, was the lender with respect to the Buckingham, Kendall, Westphalia, Tacoma, and Sussex Transactions.  (*See* Govt.'s Ex. 10 at 2; Ex. 11 at 2; Ex. 12 at 2; Ex. 13 at 2; Ex. 14 at 2).[6]

## II.    Amount of Loss for Purposes of Sentencing Guidelines

The parties agree that, because this is a fraud case, under U.S.S.G. §2B1.1., Blaney's base offense level is increased according to the amount of loss resulting from his conduct.  (Def.'s Br. at 5; Govt.'s Br. at 9).

"The application notes under U.S.S.G. §2B1.1 provide that the district court 'need only make a reasonable estimate of the loss.'" *United States v. Minor*, 488 Fed. App'x 966, 2012 WL 2913744 (6th Cir. 2012).  Under U.S.S.G. §2B1.1's application notes, loss generally is the greater of actual loss or intended loss.  *Id.*

"'Actual loss' is defined as 'the reasonably foreseeable pecuniary harm that resulted from

---

[6]In addition, even if Blaney was able to establish that the lender was not a federally insured lender, these transactions could still be considered relevant conduct for purposes of sentencing because conduct need not violate a federal law in order to be relevant conduct for purposes of sentencing.  The Sixth Circuit has held that state offenses may qualify as "relevant conduct." *United States v. Bandy*, 1999 WL 17646 at *3, 172 F.3d 49 (6th Cir. 1999) ("we hold that relevant conduct under USSG § 1B1.3(a) is not limited to conduct which constitutes a federal offense."); *see also Maken*, 510 F.3d at 657.

the offense,' which in turn is defined as 'pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense.'" *Minor*, 488 Fed. App'x at 969 (citing n.3(A)(i), (iv)).

### A.    The Reasonably Foreseeable Pecuniary Harm In This Case Is The Amount Of The Mortgage Loans.

Blaney pleaded guilty to Count Two of the First Superceding Indictment, which charges bank fraud in violation of 18 U.S.C. § 1344.  From approximately June of 2006 until around December of 2007, Blaney knowingly and with the intend to defraud, devised a scheme to obtain funds under the custody or control of financial institutions by means of materially false representations and omissions.  Blaney accomplished this scheme by causing the presentation of fraudulent Uniform Residential Loan Applications and other loan documents, which contained material misrepresentations and omissions, thereby inducing the financial institutions to approve and fund mortgage loans so that Blaney could obtain a portion of the mortgage loan proceeds.

This Court concludes that, as was the case in *Minor,* "the 'reasonably foreseeable pecuniary harm' in this case is the amount of the mortgage loans." *Minor*, 488 Fed. App'x at 969.  At the sentencing hearing, the Government established, by a preponderance of the evidence, that the total amount of the mortgage loans was $856,100.00.

### B.    The Court Shall Reduce That Amount For Appropriate Credits

From that amount, this Court must then determine the amount of any appropriate credits to be applied.

Here, the Government and Blaney disagree as to how the Guidelines should be applied to determine the amount of such credits.  Blaney asserts that, pursuant to U.S.S.G. § 2B1.1,

Application Note (E)(ii) or (E)(iii),  the appropriate credit is the "fair market value" of the collateral.  The Government contends that, pursuant to U.S.S.G. § 2B1.1, Application Note (E)(ii), the appropriate credit would be the amount the victim has recovered at the time of sentencing.  The Court agrees with the Government.

U.S.S.G. § 2B1.1, Application Note (E)(iii) provides that in "the case of a fraud involving a mortgage loan, *if the collateral has not been disposed of by the time of sentencing*," the Court should use fair market value of the collateral. (emphasis added).  That does not apply here, however, because the collateral as to all twelve transactions was disposed of prior to sentencing.  That is, none of the underlying collateral is owned, controlled, or possessed by the victim lenders.  With respect to each of the twelve transactions at issue, the mortgages were foreclosed.  With respect to ten of them, the homes were forfeited to the Wayne County Treasurer for unpaid taxes.  As to the remaining two, the lenders obtained title to the homes at the foreclosure auction, but later sold them to third parties.  Thus, collateral was disposed of prior to sentencing and U.S.S.G. § 2B1.1, Application Note (E)(iii) does not apply.

For this same reason, the second portion of U.S.S.G. § 2B1.1, Application Note (E)(ii) (stating that "if the collateral has not been disposed of" by the time of sentencing, apply a credit for the fair market value of the collateral) does not apply.

The Court concludes that the first portion of U.S.S.G. § 2B1.1, Application Note (E)(ii), which instructs the Court to reduce the amount of loss by the "amount the victim has recovered as the time of sentencing from disposition of the collateral" applies here.  There are two types of credits appropriate here.

### 1.    Credit For Mortgage Payments

First, both parties agree that a credit should be given for payments made on the mortgages.  (*See* Govt.'s Br. at 15; Def.'s Br. at 10-11).  The Government has established, by a preponderance of the evidence, that a total of $52,242.52 in payments were made on the mortgages at issue.  That amount shall be deducted from the amount of loss.

### 2.    Sales Proceeds

Second, the Court agrees that the amount of sales proceeds that the two lenders who obtained title during the foreclosure auction, and then later sold the homes to third parties, should be credited against the amount of loss.  At the sentencing hearing, the Government established, by a preponderance of evidence, that a total of $2,223.00 in such credits is warranted.  That consists of a credit of $1,000.00 for the 18455 Revere Street property and a credit of $1,223.00 for the 17215 Westphalia property.

Accordingly, applying those credits, the actual total loss is $801,634.48.  That amount consists of the following:

| Property | Loan Amount | Sales Proceeds Credit | Credit for Payments | Adjusted Loss |
|---|---|---|---|---|
| 19332 Ferguson | $63,750.00 | N/A | $10,966.80 | $52,783.20 |
| 9331 Sussex | $67,500.00 | N/A | N/A | $67,500.00 |
| 18140 Stout | $55,250.00 | N/A | N/A | $55,250.00 |
| 9419 Lauder | $58,650.00 | N/A | $1,128.16 | $57,521.84 |
| 15817 Turner | $80,750.00 | N/A | $7,550.07 | $73,199.93 |
| 17215 Westphalia | $69,300.00 | $1,223.00 | N/A | $68,077.00 |
| 13200 Tacoma | $69,300.00 | N/A | N/A | $69,300.00 |
| 13674 Thornton | $64,000.00 | N/A | N/A | $64,000.00 |
| 19630 Pelkey | $76,500.00 | N/A | $3,507.13 | $72,992.87 |

| 18455 Revere | $72,000.00 | $1,000.00 | $14,377.28 | $56,622.72 |
| 4001 Buckingham | $100,800.00 | N/A | $14,713.08 | $86,086.92 |
| 3050 Kendall | $78,300.00 | N/A | N/A | $78,300.00 |
| Total | $856,100.00 | $2,223.00 | $52,242.52 | $801,634.48 |

This loss amount corresponds to a 14-point increase under U.S.S.G. § 2B1.1(b)(1) (add 14 if the loss exceeds $400,000.00 but is less than $1,000,000.00).

### C.      The Court Rejects Several Arguments Advanced By Blaney

In addition to the arguments addressed above, Blaney makes several additional arguments, which this Court rejects.

### 1.      No Loss Because Loans Were Charged Off By Lenders

Blaney asserts that, as to nine of the twelve properties at issue, internal servicing notes indicate that the loan has been charged off, settled, or otherwise closed. Blaney argues that because the lenders consider themselves to have been "made whole" as to these loans, there can be no loss associated with these properties. (Def.'s Br. at 7-8). Blaney offers no legal authority in support of this argument.

The Court rejects this argument. The fact that a lender has charged off a loan, or otherwise closed the file on a given loan, does not alter the fact that the lender did not receive repayment of the funds loaned.

### 2.      Tax Affect Not Considered

Blaney argues that the amount of any loss must be "tax affected" (ie., that the amount of loss should be reduced by any tax benefit the lenders received from the loss). (Def.'s Br. at 11-12). Blaney offers no authority in support of this proposition.

25

Moreover, that argument has already been rejected by the Sixth Circuit. *United States v. Driver,* 1997 WL 745168, 132 F.3d 34 (6th Cir. 1997). This Court will not reduce the amount of loss by alleged tax benefits received by the defrauded lenders.

### 3.   Economic Downturn Not Considered

Blaney also argues that the Probation Department's calculation of loss is flawed because it fails to take into account the catastrophic downturn of the real estate market in 2008." (Def.'s Br. at 12-13). That is, like the Defendant in *Minor*, Blaney argues that he could not have reasonably foreseen the real estate market crash and the resulting impact it would have on the lenders' losses as to the properties at issue.

This Court rejects that argument for the same reason it was rejected by the Sixth Circuit in *Minor:*

> Unlike the application note regarding the determination of loss, the application note regarding credits against loss does not speak in terms of foreseeability. *Id.* comment. (n.3(A), (E)). The sentencing guidelines, therefore, require foreseeability of the loss of the unpaid principal, but do not require foreseeability with respect to the future value of the collateral. *See United States v. Turk*, 626, F.3d 743, 749-50 (2d Cir. 2010).

*Minor*, 488 Fed. App'x at 969.

### 4.   Lack Of Mitigation By Victim Lenders

Blaney also argues that in determining the amount of loss the Court should consider the fact that the lenders "may have abandoned their obligations with respect to the subject properties as a matter of loss mitigation strategy in light of the depressed market conditions." (PSR at A-2). Blaney offers no authority in support of his assertion that the Court should consider a victim's alleged failure to mitigate its loss.

26

The Sixth Circuit has rejected that argument, ruling that a victim's failure to mitigate its loss does not prevent attributing to a defendant the full amount of the loss:

> The loss in a fraudulent loan application case is the amount of the loan not repaid, reduced by the amount the lending institution has recovered from any assets pledged to secure the loan. *United States v. Lucas*, 99 F.3d 1290, 1296-97 (6th Cir. 1996) . . . As to [Defendant's] claim that HUD deliberately did not recover as much on the resale of the properties as it could have, this allegation is unsupported and would not, in any event, prevent the district court from attributing the entire amount of loss to [Defendant]. *See United States v. Miller*, 962 F.2d 739, 744 (7th Cir. 1992) ("victim's failure to mitigate . . . does not prevent attributing to the defendants the full amount of loss"). Accordingly, the district court's valuation of loss was not outside the realm of permissible calculations.

*United States v. Lutz,* 154 F.3d 581, 590 (6th Cir. 1998).

### 5.      Motion For Downward Departure

In his motion, Blaney asserted his belief that the Government intends to move for a downward departure in the recommended guideline range for his Co-Defendant, Gerald Payton. Blaney appears to suggest that, in order to avoid unwarranted sentencing disparities, he should also be credited with an additional one-point reduction for acceptance of responsibility – regardless of whether the Government files such a motion.  (Def.'s Br. at 19; 4/17/13 Hrg. Tr.).

At the April 17, 2013, hearing, the Government addressed that issue.  In doing so, the Government stated that there is no authority for Blaney's request and that it is clear from the Rule 11 Agreement that whether the Government seeks a downward departure or not is within the Government's discretion.  The Government also asserts that, when he signed the Rule 11 Agreement, Blaney was aware that the Government would not make a motion for a downward departure as to an additional one-point reduction.  (4/17/13 Hrg. Tr.).

Blaney has provided no authority to support his suggestion that the Government should somehow be required to file a motion seeking an additional one-point reduction for acceptance of responsibility.  At the hearing, Blaney's counsel asserted that he was raising the issue to advise the Court of the circumstances, so that the Court could consider, in sentencing Blaney, any inequities in sentencing between Blaney and Payton.

The Court agrees with the Government that the decision as to whether the Government wishes to file a motion for a downward departure, so that Blaney can obtain an additional one-point reduction for acceptance of responsibility, is a matter within the Government's discretion. (*See* Rule 11 Agreement at 7, stating "It is exclusively within the government's discretion to determine whether the defendant has provided substantial assistance" and whether to "seek a downward departure at sentencing under U.S.S.G. § 5K1.1, or a reduction of sentence pursuant to Fed. R. Crim P. 35, as appropriate.").  Nevertheless, in determining an appropriate sentence for Blaney, this Court will consider all of the §3553 factors, including the need to avoid unwarranted sentencing disparities.

## CONCLUSION

For the reasons set forth above, the Court concludes that the relevant conduct includes all twelve of the real estate transactions included in the Presentence Report.  The Court further concludes that the reasonably foreseeable pecuniary harm in this case is the amount of the mortgage loans, which total $856,100.00.   After applying appropriate credits for sales proceeds received from the defrauded vendors, and payments made on the mortgages, the adjusted total loss is $801,634.48, which results in a 14-point increase under U.S.S.G. § 2B1.1(b)(1).

In addition, the Court agrees with the Government that the decision as to whether the

Government wishes to file a motion for a downward departure, so that Blaney can obtain an additional one-point reduction for acceptance of responsibility, is a matter within the Government's discretion.  Nevertheless, in determining an appropriate sentence for Blaney, this Court will consider all of the §3553 factors, including the need to avoid unwarranted sentencing disparities.

S/Sean F. Cox
Sean F. Cox
United States District Judge

Dated:  April 18, 2013

I hereby certify that a copy of the foregoing document was served upon counsel of record on April 18, 2013, by electronic and/or ordinary mail.

S/Jennifer McCoy
Case Manager